UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MOHAMED B., : <br> : <br> Petitioner, :     Civ. No. 20-13178 (KM) <br> : <br> v. : <br> : <br> THOMAS DECKER, et al., :     **OPINION** <br> : <br> Respondents. : <br> : | |

**KEVIN MCNULTY, U.S.D.J.**

## I.    INTRODUCTION

Petitioner, Mohamed B.,[1] is an immigration detainee currently held at the Hudson County Correctional Facility ("HCCF") in Kearny, New Jersey. He is proceeding through counsel with an Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2241. (DE 9.) Presently before the Court is Petitioner's Motion for a Preliminary Injunction. (DE 10.) Respondents oppose the motion. (DE 14.) Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument. For the reasons set forth below, Petitioner's Motion for a Preliminary Injunction will be denied.

## II.    BACKGROUND

Petitioner is a native and citizen of Algeria. He entered the United States on August 8, 2015 on a tourist visa that permitted him to remain in the country until February 7, 2016. (DE 19-1 at 1.) Petitioner remained in the country beyond February 7, 2016 without authorization. (*Id.* at 1–2.) On April 6, 2017, Petitioner was arrested and charged with third-degree Sexual Abuse, in

---

[1]    Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

violation of N.Y. Penal Law § 130.55. (*Id.* at 2.) Following a jury trial, he was convicted of Forcible Touching, in violation of N.Y. Penal Law § 130.52 01, and first-degree Sexual Abuse, in violation of N.Y. Penal Law § 130.65 01. (*Id.*)

On January 25, 2020, Petitioner was taken into custody by Immigrations and Customs Enforcement ("ICE") and charged with removability for remaining in the United States for longer than permitted in violation of Section 237(a)(1)(B) of the Immigration and Nationality Act, and for having been convicted of a crime involving moral turpitude in violation of Section 237(a)(2)(A)(i) of the Immigration and Nationality Act. (*Id.* at 2.) Petitioner did not file an application for relief or seek to resist deportation to Algeria. (*Id.* at 3.) His order of removal became administratively final on March 16, 2020. (*Id.*) His detention since that time has been governed by 8 U.S.C. § 1231(a). *See Leslie v. Attorney Gen. of U.S.*, 678 F.3d 265, 268–70 (3d Cir. 2012) (stating that once an immigrant becomes subject to a final order of removal, their detention is governed by § 1231(a) absent a stay of removal from a United States Court of Appeal).

Petitioner's removal flight was scheduled for May 11, 2020. (*Id.*) However, in April 2020, ICE learned that the flight was cancelled due to travel restrictions created by the COVID-19 pandemic. (*Id.*) Despite ICE's continued efforts to deport Petitioner, Algeria's borders remain temporarily closed as a result of the pandemic. (*Id.* at 3–6.)[2] This travel restriction is the only impediment to Petitioner's removal at this time. (*Id.* at 5–6.)[3]

After being detained for over six months under § 1231(a), Petitioner received a bond hearing pursuant to the Third Circuit's decision in *Guerrero Sanchez v. Warden, York Cty. Prison*,

---

[2]  Additionally, Petitioner's flight to Algeria is expected to connect through Morocco, a county whose flights are limited due to the COVID-19 pandemic. (DE 19-1 at 3, 5.)

[3]  ICE is in possession of the travel documents necessary to effectuate Petitioner's removal. (DE 19-1 at 2.) Petitioner's passport remains valid through April 14, 2025. (*Id.* at 5.)

2

905 F.3d 208 (3d Cir. 2018). (DE 19-1 at 4–5.) Prior to the hearing, Petitioner submitted evidence to support his release from custody and filed out an ICE questionnaire. (DE 9 at 12.) Ultimately, on October 5, 2020, the Immigration Judge ("IJ") denied Petitioner's release from custody, determining that he was a danger to the community. (DE 15-1 at 26; DE 21-5 at 3–4.)

Petitioner filed his § 2241 habeas petition on September 18, 2020, challenging his prolonged detention. (DE 1.) On October 7, 2020, Petitioner filed an Amended Petition. (DE 9.) The Amended Petition raises five grounds for relief: (1) Petitioner's continued detention under § 1231(a) has become unduly prolonged, in violation of the United States Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); (2) Petitioner's continued detention violates his substantive Due Process rights under the Fifth Amendment; (3) Petitioner's October 5, 2020 bond hearing violated his rights under the Due Process Clause of the Fifth Amendment and the Third Circuit's precedent in *Guerrero-Sanchez*; (4) Petitioner's detention during the COVID-19 pandemic violates his rights under the Due Process Clause to be free from punitive conditions of confinement; and (5) Respondents' failure to provide adequate medical care and protection to individuals, such as Petitioner, who are at high risk of serious harm from COVID-19 violates Petitioner's rights under the Due Process Clause. (*Id.* at 39–41.)

Petitioner also separately filed this Motion for a Preliminary Injunction. (DE 10.) The motion argues that Petitioner is likely to succeed on his claims that: his continued detention violates both the post-removal-period detention statute, 8 U.S.C. § 1231(a)(6), and the law set forth in *Zadvydas*; and that he was denied procedural due process at his October 5, 2020 bond hearing. Petitioner's motion requests his immediate release and the enjoinder of Respondents from re-arresting him until his removal can be guaranteed. (*Id.* at 43.)[4] Respondents have filed opposition

---

[4] Petitioner's motion does not allege success on the merits of his conditions of confinement or deliberate indifference claims. (*See generally* DE 10; *see also* DE 18 at 12 (stating that Petitioner's

3

to the motion and Petitioner has filed a reply. (DE 14; DE 18.) Both parties provided supplemental submissions as well. (DE 19; DE 20.) The matter is now fully briefed.

## III. JURISDICTION

Under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that this custody violates the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). A petitioner may seek § 2241 relief only in the district in which he is in custody. *United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009). To the extent that Petitioner alleges that his detention is unlawful or unconstitutional, this Court has jurisdiction over Petitioner's claims as he is detained within this district.

## IV. LEGAL STANDARD

Injunctive relief is an "extraordinary remedy" and "should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994) (internal quotation marks omitted). In order to obtain a preliminary injunction, the moving party must show the following:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (alteration in original) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)).

The movant bears the burden of establishing "the threshold for the first two 'most critical' factors

---

conditions of confinement and deliberate indifference claims are "not the subject of the current motion for a preliminary injunction.")

4

. . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* And a showing of irreparable harm requires a movant to show that they are "more likely than not to suffer harm in the absence of preliminary relief." Reilly, 858 F.3d at 179. The strength of a claim on the merits is in a kind of resonance with the balance of the harms: "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).

## V.      DISCUSSION

### A.      Likelihood of Success on the Merits

Petitioner's argument that he is likely to succeed on the merits of his claims is twofold. (DE 10 at 11–20.)  First, Petitioner argues he is likely to prevail on his claim that his continued detention violates both the post-removal-period detention statute, 8 U.S.C. § 1231(a)(6), and the Due Process Clause of the Fifth Amendment. (*Id.* at 11.) Second, Petitioner asserts he is likely to prevail on his claim that he was denied procedural due process at his October 5, 2020 bond hearing. (*Id.* at 16.)

#### i.      *Prolonged Detention*

Petitioner contends that his detention for almost eight months has become unconstitutional because his future removal is not reasonably foreseeable given Algeria's indefinite border closure. (DE 10 at 11–13.) Petitioner relies on the United States Supreme Court's decision in *Zadvydas*,

which stated that, "if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." (*Id.* (quoting *Zadvydas*, 533 U.S. at 699–700).) He further references internet sources from which he concludes that the Algerian borders are likely to remain closed "for a long time." (DE 9 at 14–15.) As a result of these circumstances, Petitioner submits that his continued detention violates both § 1231(a) and the Due Process Clause of the Fifth Amendment. (*Id.* at 14–16.)

Respondents maintain, however, that § 1231(a) authorizes an immigrant's continued detention so long as the detention remains reasonably necessary to effectuate the immigrant's removal. (DE 14 at 9.) Respondents submit that the only impediment to Petitioner's removal is Algeria's COVID-19 related travel restrictions and that as soon as those restrictions permit, ICE intends to carry out Petitioner's removal. (*Id.* at 10.) Respondents argue this is a situation "far different" from those envisioned in *Zadvydas,* where removal was no longer practically attainable because of an inability to obtain a travel document or the refusal of a country to accept an individual. (*Id.*)

Section 1231(a) creates a ninety-day removal period during which the government must detain persons still awaiting removal. 8 U.S.C. §§ 1231(a)(1)(A), 1231(a)(2). Once the ninety-day removal period expires, the government may continue to detain, or may release on bond, individuals who are deportable based on various specified grounds under 8 U.S.C. § 1231(a)(6). *Zadvydas*, 533 U.S. at 688–89. In *Zadvydas*, the United States Supreme Court found that § 1231 does not authorize indefinite post-removal-period detention. *Id.* at 689. Instead, such detention is limited "to a period reasonably necessary to bring about that alien's removal from the United States." *Id.* The Supreme Court noted that six months would be a "presumptively reasonable" period of post-removal-order detention under § 1231. *Id.* at 701. After those six months, the burden

6

is on the immigration detainee to demonstrate that there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* If the immigration detainee makes that showing, the burden shifts to the government to "respond with evidence sufficient to rebut" that presumption. *Id.*

Recently, other courts within this district have addressed similar claims related to *Zadvydas*'s reasonably foreseeable standard during the COVID-19 pandemic. These courts have held that a country's COVID-19 travel restrictions are insufficient to show that an immigration detainee's removal is not reasonably foreseeable. *Jaime F. v. Barr*, Civ. No. 19-20706, 2020 WL 2316437, at *5 (D.N.J. May 11, 2020); *Francis S.M. v. Decker*, Civ. No. 19-8053, 2020 WL 1956053, at *4 (D.N.J. Apr. 23, 2020).[5] In *Jaime F.*, the petitioner argued that his removal to Venezuela was not reasonably foreseeable because travel to the country was restricted. *Id.* at *5. However, Judge Salas found that although travel to Venezuela was restricted as a result of the county's quarantine, there were "no impediments to prevent Petitioner's removal as soon as the national quarantine in Venezuela ends." *Id.* Thus, Judge Salas determined that the petitioner's removal *was* reasonably foreseeable. *Id.* Similarly, in *Francis S.M.*, Judge Arleo denied a petitioner relief under *Zadvydas*, finding that while travel to a petitioner's native country was currently restricted due to COVID-19, ICE intended to schedule the petitioner on the earliest flight available

---

[5] Other district courts across the country have held similarly as well. *See Filmon Tekleweini-Weldemichael v. Pat Brook*, Civ. No. 20-660, 2020 WL 5988894, at *5 (W.D. La. Sept. 9, 2020) (report and recommendation adopted) (rejecting petitioner's argument that there is "no significant likelihood of his removal in the reasonably foreseeable future because Eritrea's borders are 'closed'"); *Brathwaite v. Barr*, Civ. No. 20-174, 2020 WL 4380666, at *14 (W.D.N.Y. July 31, 2020) ("Where, as here, the Government indicates it has plans to remove Brathwaite after his Second Circuit case is resolved, provided it can do so consistent with COVID-19 travel restrictions, [Petitioner's] claim fails."); *Ramirez v. Searls*, Civ. No. 20-6018, 2020 WL 2748203, at *3 (W.D.N.Y. May 27, 2020) (finding the Government rebutted "good reason" under *Zadvydas* where the Government obtained travel documents in March and indicated it planned to remove petitioner to Venezuela in June 2020, "provided that it can do so consistent with any Covid-19 travel restrictions.").

in order to effectuate his removal. *Francis S.M.*, 2020 WL 1956053, at *4. As a result, Judge Arleo determined that the petitioner could not prevail on his claim that there was no reasonable likelihood of removal. *Id.* at *5.

There does not seem to be any dispute that travel restrictions to Algeria have delayed Petitioner's removal. Likewise, the parties appear to agree that there is no other impediment. Travel documents have issued, and they remain valid through April 2025.

My own brief check with the U.S. State Department website reveals that commercial flights into Algeria were suspended. There is a facially relevant potential exception to the travel ban:

> Are U.S. citizens permitted to enter? Yes. However, please be advised that at this time, it seems most travel is by exception and driven by legitimate repatriation needs. Algeria does require a visa. Please visit the Algerian Consulate in New York (https://www.algeria-cgny.org/visa-application/) or the Algerian Embassy in Washington, D.C. (https://www.algerianembassy.org/consular-affairs/visa/visa-instructions.html)

U.S. Dep't of State, *Country Specific Information*, https://dz.usembassy.gov/covid-19-information/ (last visited Nov. 16, 2020).

Recent guidance from the U.S. embassy in Morocco notes that the state of COVID emergency which expired as of November 10, 2020, has been extended through December 10, 2020. Commercial flights are largely suspended.

- Air travel to and from Morocco remains restricted to specific categories of travelers. Citizens and residents of Morocco, as well as foreign nationals of visa-exempt countries (which includes U.S. citizens) with reservations with Moroccan hotels or travel agencies and business persons invited by Moroccan companies, are allowed to enter and depart. Special operations flights serving these passengers, including a direct flight on Royal Air Maroc (RAM) between Casablanca (CMN) and New York's John F. Kennedy International Airport (JFK), will continue to operate under the Health State of Emergency. U.S. citizens wishing to return to the United States should book directly with the airlines. U.S. citizens seeking to fly from Morocco to a destination other than the United

> States are required to obtain an exceptional authorization from local authorities.

U.S. Embassy & Consulate in Morocco, *COVID-19 information*, https://ma.usembassy.gov/25161/ (last visited Nov. 16, 2020).

The government's most recent affidavit states that "[r]emoval flights to Morocco have resumed on a limited basis." Declaration of Deportation Officer Naquan Bacchus, ¶ 28 (DE 19-1 at 5). The government does not, however, set a specific date for removal.

The facts of this case are similar to those in *Jaime F.* and *Francis S.M.* ICE possesses the required travel documents, appears to be working to effectuate removal, and states that Petitioner's removal will be scheduled consistent with the availability of a flight. Under the circumstances, I will follow those precedents, and find that Petitioner's removal has not crossed the line to "not reasonably foreseeable." The government is cautioned that my finding has a limited shelf life, and depends on its representation that removal flights have resumed, if only on a limited basis. I enter this order without prejudice, and will not permit detention to continue indefinitely. I note also that this decision is without prejudice to Petitioner's separate application concerning release on bond pending removal.

> ii. *Bond Hearing Claim*

Petitioner also argues that he is likely to prevail on the merits of his claim that he was denied procedural due process at his October 5, 2020 hearing. (DE 10 at 16.) He contends that he did not receive an individualized bond hearing because the IJ failed to examine the facts underlying his criminal conviction or articulate why he posed a future danger to society. (*Id.* at 16–21.) Petitioner also submits that the IJ failed to consider alternatives to detention when rendering her decision; a fact which Petitioner alleges is reversible error. (*Id.* at 17.) Respondents assert, however, that this Court lacks jurisdiction to hear Petitioner's claim regarding his bond hearing

because Petitioner has not yet appealed the decision to the Board of Immigration Appeals ("BIA"). (DE 14 at 11.) As a result, Respondents state Petitioner has not exhausted his administrative remedies. (*Id.*) Yet, even assuming this Court had jurisdiction, Respondents contend that Petitioner would still be unlikely to succeed on the merits of his claim because he only argues the weight of the evidence submitted at the hearing – an argument that does not demonstrate a due process violation under Third Circuit precedent. (*Id.* at 12.)

In *Guerrero-Sanchez*, the Third Circuit held that "§ 1231(a)(6) affords a bond hearing after prolonged detention to any alien who falls within the ambit of that provision." *Guerrero-Sanchez*, 905 F.3d at 211. The Third Circuit adopted a "six-month rule," meaning that "an alien detained under § 1231(a)(6) is generally entitled to a bond hearing after six months of custody." *Id.* at 226 (parenthetical omitted). At that hearing, an immigration detainee "is entitled to be released from detention unless the government establishes that the alien poses a risk of flight or a danger to the community." *Id.* at 224.

Here, even assuming Petitioner's procedural claim is properly raised before this Court,[6] I do not find that Petitioner has demonstrated a likelihood on the success of the merits of his claim. While a district court may not review an IJ's discretionary determination on bond, the court may review "the legal standard underlying immigration officials' actions and … evaluate legal and constitutional claims on that basis." *Quinteros v. Warden Pike Cty. Corr. Facility*, 784 F. App'x

---

[6] Petitioner does not indicate that he has appealed the denial of his bond hearing to the BIA. Courts within this district have held that procedural due process claims may not be adjudicated in a habeas petition "until such time as [petitioner] … exhaust[s] his remedies." *Bravo v. Green*, Civ. No. 16-4937, 2017 WL 2268315, at *3 (D.N.J. May 24, 2017); *see also Karim Tahir G. v. Jeff Sessions*, Civ. No. 18-17175, ECF No. 58 (D.N.J. Apr. 30, 2020) ("At the outset, Petitioner's appeal is still pending before the Board of Immigration Appeals, and therefore his claims regarding the sufficiency of the hearing appear unexhausted."); *Nicole S. A. B. v. Edwards*, Civ. No. 19-14608, 2019 WL 6606864, at *3 (D.N.J. Dec. 5, 2019) (stating that the Court lacked jurisdiction to review a bond determination under § 1231(a) in part because the petitioner did not file an appeal of the IJ's decision). I have nevertheless considered the substance of the claim.

75, 77 (3d Cir. 2019) (stating that "[t]he Immigration and Nationality Act shields from review '[t]he Attorney General's discretionary judgment regarding the application' of the statute governing immigration detention" and recognizing that "'[n]o court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.'" (quoting 8 U.S.C. § 1226(e))); *see also Borbot v. Warden Hudson Cty. Corr. Facility*, 906 F.3d 274, 276 (3d Cir. 2018) ("[T]he Fifth Amendment entitles aliens to due process of law in deportation proceedings." (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993))). In bond hearings, as well as other adjudicative contexts, due process requires the following three things: "[a]n alien: (1) is entitled to factfinding based on a record produced before the decisionmaker and disclosed to him or her; (2) must be allowed to make arguments on his or her own behalf; and (3) has the right to an individualized determination of his [or her] interests." *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001) (internal citations and quotation marks omitted) (second alteration in original); *see also Quinteros*, 784 F. App'x at 78 (reiterating same standard).

Here, Petitioner argues the IJ failed to abide by the third prong – to provide an individualized determination. (DE 10 at 17–20.) Yet based upon the record provided to the Court, it appears Petitioner received all due process to which he was constitutionally entitled. The IJ applied the appropriate clear and convincing evidence standard that is required in a *Guerrero-Sanchez* hearing. (DE 15-1 at 26–27; DE 21-5 at 2.) The IJ provided Petitioner the opportunity to present reasonable and mitigating evidence at his hearing, as well as the opportunity to respond to the evidence and arguments set forth by the Government. (DE 15-1 at 6–26.) And the IJ made an individualized determination of Petitioner's danger to the community based upon his criminal convictions. (*Id.* at 26–27; DE 21-5 at 3–4.) At the hearing, the IJ considered Petitioner's

conviction, the elements underlying his particular offense, and the mitigating evidence Petitioner put forth about his involvement in the crime. (DE 15-1 at 26–27.) In her written decision, the IJ addressed the underlying facts of Petitioner's case, citing that Petitioner used his body weight to press the victim against a wooden trunk and that he "continued to pursue sexual activity with [the victim] after she explicitly stated she did not wish to have sexual intercourse with him that night." (DE 21-5 at 3–4.) The IJ used these facts as evidence of Petitioner's danger to the community. (*Id.*) The IJ also addressed the significance that the sentencing judge "issued an eight year order of protection in favor of the victim," and emphasized that Petitioner is required to register as a sex offender, which "speaks directly to the ongoing danger [he] presents to the community." (*Id.*) While the IJ considered the letters of support presented to the court, she ultimately determined that Petitioner "continues to pose a danger to the community." (*Id.*) Given these findings by the IJ, it is apparent that she did, in fact, provide Petitioner with an individualized hearing.

Petitioner also challenges the fact that the IJ failed to consider alternatives to detention. (DE 10 at 17.) He argues that this failure constitutes reversible error and he cites to *Ousman D. v. Decker*, Civ. No. 20-9646, 2020 WL 5587441 (D.N.J. Apr. 17, 2020) in support of his claim. (DE 10 at 17; DE 18 at 10.) In *Ousman D.*, Judge Vazquez found that a petitioner did not receive a constitutionally adequate bond hearing because there was "no evidence that the IJ considered less restrictive alternatives to detention." *Ousman D.*, 2020 WL 5587441, at *4. Importantly, however, *Ousman D.* involved a situation in which the petitioner was *not* found to be a danger to the community. *Id.* at *2. That petitioner was denied release on bond solely because the IJ determined that he posed a flight risk. *Id.* (stating that the IJ denied bond because the petitioner was "an extremely high flight risk"). Traditionally, courts have been far more willing to fashion conditions short of detention to ensure a person's appearance as required. Indeed, the case relied upon by

12

*Ousman D.* for its holding, *Leslie v. Holder,* 865 F. Supp. 2d 627, 640 (M.D. Pa. 2012), addressed whether any appropriate conditions of release could mitigate the petitioner's *flight risk*. In *Leslie*, as in *Ousman D.*, the petitioner was not found to be a danger to the community. *Id.* Thus, *Leslie* and *Ousman D.* presented different scenarios than the one at issue here, and it is unclear whether their rulings would equally apply when an IJ denies bond solely because an individual presents a danger to the community. Indeed, the Court is unable to locate, and Petitioner does not cite to, any such case within this Circuit. Accordingly, based upon the evidence presented, the Court does not find that Petitioner has established he is likely to succeed on the merits of this claim that he was denied due process at his recent bond hearing.

### B. Irreparable Harm

The second factor in determining whether an individual is entitled to a preliminary injunctive relief requires the moving party to show that he is "more likely than not to suffer irreparable harm" absent the relief requested. *Reilly*, 858 F.3d at 179.

Continued detention, of course, represents a significant and ongoing harm, requiring legal and factual justification. Petitioner argues further that if he remains detained during the COVID-19 pandemic, he faces significant physical harm because of his underlying medical conditions and the "alarmingly inadequate" conditions of confinement at HCCF. (DE 10 at 21, 31.) In support of his argument, Petitioner presents evidence that he suffers from hypertension, "adjustment disorder with mixed anxiety and depressed mood," and a history of tobacco use. (DE 10-2 at 1.)[7] He also submits his own declaration, as well as those of other current and former detainees, which outline the insufficiencies in HCCF's health and sanitation protocols. (DE 10-5; DE 10-7; DE 10-8; DE

---

[7] Petitioner relies upon the declaration of Dr. Andrea Lim, who reviewed Petitioner's medical records and opines that Petitioner's current incarceration places him at higher risk of contracting COVID-19 given his underlying health conditions. (DE 10-2 at 4.)

10-9.) Petitioner indicates, among other things, that correctional officers are not enforcing social distancing or mask wearing within the detainee housing units; that his housing unit's sanitation team, of which he is a member, only cleans common areas once or twice per day; that he has never seen anyone clean the communal phones; and that his housing unit has seen a large influx of new detainees within the past few weeks. (*Id.* at 6.) Given these circumstances, Petitioner alleges he is more like to contract COVID-19 at HCCF than if he were released to his employer's home where he could engage in preventive measures. (DE 10 at 35.)

Respondents argue, however, that Petitioner's detention is rationally related to the purpose of § 1231(a)(6) itself, as well as to the legitimate governmental objectives of protecting the public and ensuring Petitioner's removal. (DE 14 at 13.) Respondents maintain that they recognize the seriousness COVID-19 poses and, as a result, have enacted numerous measures at HCCF to prevent the spread of the virus. (*Id.* at 14.) Respondents provide the declaration of Ronald Edwards, the Director of the Hudson County Department of Corrections and Rehabilitation, to detail HCCF's COVID-19 protocols. (DE 21-8.) The protocols are lengthy and detailed, and I highlight only some of them here. To allow for social distancing, the facility has placed detainees on a restricted schedule with staggered recreation within common areas. (*Id.* at 7.) The detainees have been educated as to sanitary practices and provided with masks to wear whenever they leave their cells. (*Id.* at 5, 12.) Detainees are each given at least two bars of soap to use, unlimited access to water, and disinfectant wipes upon request. (*Id.* at 10.) Medical care complies with guidelines issued by the Centers for Disease Control and Prevention ("CDC"). (*Id.* at 8.) Individuals who show symptoms consistent with those of COVID-19 are evaluated immediately, assessed for hospital placement, and monitored daily. (*Id.* at 8–9.) Detainees who may have been exposed to a confirmed case of COVID-19 are placed in "cohorts" for fourteen days to prevent any further

spread. (*Id.* at 9.)[8] Additionally, "compliance officers" are ensuring that correctional officers are wearing face masks while working in the facility. (*Id.* at 12.) Respondents state that these measures, among the many others outlined by Mr. Edwards, militate against a finding that Petitioner is more likely than not to suffer irreparable harm if he remains detained. (DE 21 at 21–22.)

In *Hope v. Warden York Cty. Prison*, the Third Circuit addressed the issue of what constitutes "irreparable harm" for immigrants detained during the COVID-19 pandemic. 972 F.3d 310, 331 (3d Cir. 2020). The Third Circuit held that a district court must assess a petitioner's "unique medical histor[y], medical risks, healthcare access needs, detention conditions, and release circumstances" to determine whether the petitioner would suffer more harm in detention than if released. *Id.* The Court of Appeals stated that the mere fact that an individual may contract the virus cannot demonstrate irreparable harm because the risk "applies regardless [of] whether Petitioners are detained or released." *Id.*

Here, Petitioner has submitted evidence that he suffers from underlying medical conditions – hypertension and a history of tobacco use – that the CDC has recognized may place him at increased risk for serous illness if he contracts COVID-19. (DE 10-2 at 2; DE 10-5 at 4; DE 10-6 at 111); *see also* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Nov. 16, 2020). Respondents dispute that Petitioner actually suffers from hypertension, stating that he has never been diagnosed with the condition while at

---

[8] Mr. Edwards states that "cohorting" is the act of housing together individuals who are asymptomatic but have had known exposure to a person with confirmed COVID-19. (DE 21-8 at 9.) Their movement is restricted for the duration "of the most recent incubation period" and if, after fourteen days, no new cases of COVID-19 develop, the cohorting is discontinued. (*Id.*)

15

HCCF. (DE 14 at 12–13.) Respondents do not appear to disagree, however, that Petitioner has a self-described history of smoking. (DE 14 at 13.)

With regard to detention conditions, Petitioner has submitted evidence that reveals possible shortcomings in HCCF's COVID-19 protocols. (DE 10-5; DE 10-7; DE 10-8; DE 10-9.) The Court notes, however, the significant efforts HCCF has implemented to stop the spread of the novel coronavirus within its facility. (DE 21-8.) Indeed, as of October 27, 2020, the last date for which the Court has data, there were no known cases of COVID-19 among any of the inmates, immigration detainees, or staff, although test results for 51 inmates and detainees remain pending. (*Id.* at 10–11.) HCCF has also mandated that all law enforcement officers be tested for COVID-19 and submit to random COVID-19 testing for continuous monitoring. (*Id.* at 11.) Additionally, all inmates and detainees present at HCCF as of June 8, 2020, were tested for COVID-19, and all incoming inmates and detainees are tested upon arrival so the facility may establish and maintain "fully tested and clean housing tiers." (*Id.*)

As for Petitioner's release conditions, he submits that, if released from HCCF, he could reside in a two-story family home with his employer in Astoria, New York. (DE 10 at 26–27.) There, he would have access to his own bed, bathroom, and kitchen. (*Id.* at 36.) He would also be able to socially distance, wear a mask, and have access to health care services and quality public hospitals in the area. (*Id.*) Additionally, Petitioner states that Astoria currently has very low transmission rates. (*Id.*) At the time Petitioner's motion was filed, Astoria's positivity rate for COVID-19 testing was 1.6%. (*Id.*) As of a few days ago, the positivity rate in Astoria had climbed to around 7%. New York City Dep't of Health, *COVID-19 Data*, https://www1.nyc.gov/site/doh/covid/covid-19-data-totals.page#zip (last visited Nov. 16, 2020).

Ultimately, after considering each of these factors, I find that Petitioner is more likely to contract the virus in detention than he would be if released (and if, of course, when on release he actually adheres to the safety regimen that he describes). The disparity is perhaps not dramatic, however. While HCCF's efforts to prevent the spread of COVID-19 appear to be working, Petitioner has submitted evidence that these prevention practices may not be perfect. He states that social distancing is not always enforced, detainees do not always wear their masks while in the common areas, and common surfaces are not sanitized often enough. (DE 10-5 at 6–7.) Comparatively, if released, Petitioner could live in his employer's home where he can to a great degree isolate and socially distance from others, a measure that is "vital for the prevention" of COVID-19. *See* Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Nov. 16, 2020). Such preventive measures are important for individuals, such as Petitioner, who suffer from conditions that place them at higher risk for serious illness from COVID-19. He would, however, be living and presumably working in a community where the infection rate is significant and apparently rising. I thus find that Petitioner has made a showing of irreparable harm, if not an overwhelming one. *Reilly*, 858 F.3d at 179.

Irreparable harm, however, is only one of the two "gateway factors" required for a preliminary injunction, and he has not met the other, likelihood of success factor. *See Reilly*, 858 F.3d at 179. As a result, I need not address the remaining two factors – the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. *Id.* (holding that a court considers the final two factors only if the first two "gateway factors are met"); *see also Emerson O. C.-S. v. Anderson*, Civ. No. 20-3774, 2020 WL 1933992, at *7 (D.N.J. Apr.

22, 2020) (declining to address remaining preliminary injunction factors after determining that movant had not shown a likelihood of success on the merits of his claim). Petitioner's Motion for a Preliminary Injunction is denied.

## VI. CONCLUSION

For the foregoing reasons, Petitioner's Motion for a Preliminary Injunction (DE 10) is denied. An appropriate Order follows.

DATED: November 16, 2020

/s/ Kevin McNulty
_____
KEVIN MCNULTY
United States District Judge